*172 Mr. Justice McLEAN.
I dissent from the opinion of the court. And as the case involves high principles .and, to some extent, the action and powers of a sovereign state, I will express' my opinion.
This was an amicable action to try whether the defendants, who are contractors for the transportation of the mail on the Cumberland road,- are liable, under the laws of Pennsylvania,- to pay- toll for stages in which the mail of the United Státes is conveyed.
This road was constructed by the federal government through the state of Pennsylvania, with its consent. Whether this power was thus constitutionally exercised, is an inquiry not necessarily involved in the decision of-this case. The road was made, and for some years it was occasionally repaired by appropriations from the Treasury of the United States. These appropriations were made with reluctance at -all' times, and sometimes were defeated. • This, as a permanent system of keeping the road in repair, was,-of necessity,abandoned; .and, with the assent of Pennsylvania, Congress passed a-bill to construct toll-gates: and impose ¿ tax.-on those who used the road. This bill was vetoed- by the President, on. the ground that Congress had no constitutio; ,al- powerto .pass it. The plan was then adopted to cede the road, on certain conditions, to the states' through which it had been established.
On -the 4th of April, 1831,' Pennsylvania passed “An act for the preservation of the Cumberland road.”
By'the 1st section it -was-.provided, that as sdon as the consent of the government of the United States shall have been obtained, certain commissioners, who were named, were tó be appointed, whose duties.in regard to the road'were specially defined. . The 2d section enacted, that to keep so much of the road in repair as lies in' the state of Pennsylvania, and pay the expense .of collection, &c.,. the commissioners should cause six toll-gates to be erected, and certain rates of toll were established. To this section there was a proviso, that no toll shall be received or collected for the passage of any wagon dr. carriage -laden with the property of the United States, or any. cannon or military stores belonging to the-United States or to any of the-states composing the union.”
By the 4th section the tolls were to be applied, after paying expenses of collection, &c., to the repairs of the road, the commissioners having. power to increase them, provided they shall not exceed-the rates of toll on the Harrisburg and Pittsburg road. The last section'provided that the toll" should not be altered below or above a' sum necessary to defray the expenses incident to the preservation and repair of said road, &c., and also, “that no change, alteration, or amendment shali-ever be adopted, that will in any wise defeat or affect the true intent and meaning of this act.”
By the 10th section of the above aet it was declared to have no effect lintil Congress should assent to the same, “ and •until'so much *173 of the' said road as passes through the state of Pennsylvania be first put in a good state'of repair, and an appropriation madehy Congress for erecting toll-houses and toll-gates thereon, to be expended under the autherity of the commissioners appointed by this act.”
By their act of the 24th.of June, 1834, Congress appropriated $300,000 to repair the Cumberland road east of the Ohio river, which'referred to the above act of Pennsylvania; and also to similar acts passed by Virginia and Maryland. And in the 4th section of the aet it was provided, “that as soon as the sum by this act appro-priáted, or so much thereof as is necessary,' shall be expended in the repair of said road agreeably to the provisions of this act, the same shall be- surrendered to the states respectively through which said road passes; and the'United States shall not thereafter be subject to any expense-for repairing' said road.” This surrender of the road was accepted .by Pennsylvania, by an act of. the. 1st of April, 1835.
■ The above acts constitute the compact between the state of Penm-sylvania and the union, in regard to the surrender of this road. The nature .and extent of this compact ¿re pow to be considered:
As before remarked; the constitutional power of Congress to -construct this road isr-not necessarily involved in 'this decision. By the act-of Congress of the-30th of April, -1802, to authorize the people-of ¡Ohio to'“form a constitution and state government,” among other propositions for- the acceptance of • thé state, it was proposed .that “ five-per-cent, of the net proceeds' of the-lands lying-withiu the said state, sold- by Congress, should be applied to the laying out and making public roads, leading from tire navigable waters falling into the. Atlantic, to the-.Ohio,.-to: the. said state,land through the samé; such roads to be laid under the authority of Congress, with the consent of the several states through which'the roads shall pass: provided the state shall agree not to tax land sold by the government until after the- expiration of five years from the time of such sale.”’ - -
By the'2d section of the act of thé 3d March, 1803, three .per. cent, of thembove- fund was placed' at the disposition of the state, tp be “ applied -to .the laying out, opening, and- making roads, within the state.” ' .
The above conditions, having been accepted by Ohio, constituted the compact under which .the Cumberland .road.was laid' out and.constructed by the authority of Congress. - And of this work it ttfay be. said, however great has been the expenditure through .the inexperience ór unfaithfulness cf public agents, that no public wrork has been so diffusive in its benefits to the • country. It opened a new avenue of commerce between the eastern and western states. Since its completion, and while it whs kept in repair, the annual transportation of goods and travel on it saved an expense equal to no inconsiderable part of the cost of the road. But its cession to the - states *174 through which it was established was found necessáry to raise, by tolls, an annual revenue for its repair.
Whatever expenditure was incurred in the construction of this road beyond the two per cent, reserved by the compact with Ohio, was amply repaid by the beneficial results of the work; and this was the main object of Congress. It was a munificent object, and worthy of the legislature of a great nation.
The road was surrendered to Pennsylvania and .the other states through which it had been constructed. But what was ceded' to Pennsylvania ? All the right of the United States which was not reserved by the compact of cession. This right may be supposed to arise from the compact' with Ohio; the consent of Pennsylvania to the construction of .the road, and the expense of its. construction, including the sums paid to individuals for the right of way. These, and whatever jurisdiction over the road, if any, might be exercised by the United States, were surrendered to Pennsylvania.- The road then .must be considered as much within the jurisdiction' and control of Pennsylvania, excepting the rights reserved in the compact, as if it had been constructed by the funds of that state. It is, therefore, important to ascertain die extent of the rights reserved by the United States.
■ In the closing paragraph of the 2d section of the act of 1831, above cited, it is provided, “ that no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States, or to any of the states composing this union.” In addition to this, there were certain limitations imposed, as to the amount of tolls, on the state of Pennsylvania, which need not now be considered.
Some light may be cast on the import of the above reservation by a reference to somewhat similar compacts made in regard to the same subject between the .United States and the states of Ohio, Maryland, and Virginia. The Ohio act of the 2d of March, 1831, provides, in thé 4th section, “ that no toll shall be received or collected for the passage of any stage or coach conveying the United States mail, or horses bearing the same., or any wagon' or carriage laden with the property of the United States, or any cavalry or other hoops, arms, or military stores, belonging to the same, or.to any of the states .comprising this union, or any person or persons on duty in the military service of tire United States, or of the militia of any of the states.” The 4tlr section of .the Maryland act of the 23d of January, 1832, provided, “ that no tells shall be received or col-lectéd for the passage of any wagon or carriage laden with the. property of the United States, on any cannon or military stores belonging to the United States, or to any of the stale's, composing this union.” In the Virginia -act of thé 7th of February, 1832, it is provided, “that no toll shall be received or collected for the passage, of any *175 stage or coach conveying the United States mail, or horses bearing the same,' or any wagon or carriage laden with property of the United States, or any cavalry ..orAother troops, army or military stores, belonging to- the feme, or to any*of the states comprising this union, 'or any person or persons on duly in the military service of the United States, or of the militia of any of the,states.”
The reservations in tire Pennsylvania and Maryland' acts are the same, and differ materially from those contained in-the acts of Ohio and Virginia. In the latter acts the mail-stage is excepted, but not in the former. - Pennsylvania and Maryland exempt from toll “ any .wagon or carriage ltulen with the property of the United States;” but the same exemption is contained in the Ohio and Virginia laws in addition to 'that of the-mail-stage. Now, can the reservations in these respective acts be construed to mean the same thing ? Is there no difference between the-acts of Ohio and Pennsylvania? Their language is different, and must not their meaning be ¿sought from the words in the respective acts ? They are separate and distinct compacts. The -Ohio law was first enacted, and was, probably, before the legislature of Pennsylvania when their .act was passed. But whether this be the fact -or not, they were both sanctioned, by Congress; and the-question-is, whether both compacts are substantially the same ? That .the legislature's did hot mean the same thing seems to me to be clear of all doubt.' Did Congress,' in acceding to these acts, consider that they were of the same import ? Such a presumption cannot.be sustained,Jwithout doing'violence to the language of the respective acts.
In both acts wagons laden with the property of the United States are exempted. In the Ohio act the mail-stage is exempted from toll, but not in the' act of Pennsylvania. Now, is the mail-stage exempted from toll by both acts- or by neither ? Is not either of these positions equally unsustainable ? The -exemption of the mail-stage must be struck out of.the Ohio-law to sustain on.e- of these positions, and to sustain the other it must be inserted in the' act of Pennsylvania. Does not the only difference consist in striking out in the one case and inserting in the other ? This must be admitted unless the words, “ wagon or carriage laden with the property of the United States,” mean one thing in the Ohio law, and quite a different thing 'in the law of Pennsylvania. These words have a sensible and obvious application in both acts, without including the mail-stage. In the Ohio law the words “ no toll shall be received or collected for the- passage of any stage or coach conveying the United-States mail,” cannot,-by any sound construction, be considered as surplusage; and yet they must be so considered if the Pennsylvania, act- exempt the mail-stage.
When one speaks of transporting the property of the United States, the meaning of the terms “ property of the United States,” is never mistaken. They mean munitions of war, provisions pur *176 chased for the support of the army, and any other property purchased for the public revenue.- They do not mean the mail of the-United States. A wagon laden with property is understood to be á wagon used for the transportation of property,, in the ordinary sense of such terms. A wagon or carriage being laden is understood to-have a full or usual load. The mail-stage of the United States is never spoken of in this sense. It is used for the transportation of passengers as well as the. mail, and in this view it is undoubtedly considered when spoken of in conversation,, and especially when referred to-in a legislative.act. In no. sense can the mail-stage be considered a “ carriage laden with the property of the-United States.” The same exception applies to a wagon' or carriage' laden with- the property of'a state. Now no one -can' doubt _the meaning of the exception -thus applied. And can a different meaning be given to the same words when applied to the United, States ?' Certainly not, unless the -mail can' be denominated the "property of the United States.
The mail of the United States is. not the- property of the United States. What constitutes the mail ? Not the leathern bag, but its contents. A stage load of mail-bags coul'd not be called -the mail. They might be denominated the property of the United States, but not the -mail. The mail consists of packets of letters made up with post-bills, and directed to certain' post-offices for distribution or delivery ; and whether these be conveyed in a bag o.r out of it, they are equally the máil; but no bag without them is. or can be called the mail. Can these packets- be said to be the property of .the United States ? The" letters and their contents belong to individuals. No officer in the “government can abstract a letter, from the mail, not directed to him, without -incurring the penalty of. the law. And can these letters or mailed pamphlets or newspapers be called the property of the United States ? They in no sense, belong to the United States, and are never so denominated. If a letter be stolen ’ from the mail which contains a bank-note, the property in the note ,is laid in the person who wrote the letter in which the note is enclosed. From these views I am brought to the conclusion that, neither party to the compact under consideration could have understood “ a wagon or carriage laden with the property of the United States,” as including the mail-stage of the United States.
Are there any considerations connected with this subject which lead to a different conclusion from-that stated. The fact that four distinct compacts wrere entered into with four states to keep this road in repair, cannot have this effect. We must judge of the intention of the parties to the compact by their language. I know of no other rule of construction. Two of these compacts exempt the mail-stage from toll, and two of them do. not exempt it. Now, if the'same construction, in this-respect,must be.given to all of them," *177 which of the alternatives .shall be adopted? Shall the mail-stage be exempted by all of them, or not exempted by any .of them ?
What effect can the expenditures of the United States, in -the construction of this road, have Upon this question? In my judgment,'none whatever. The reservation must be construed by its terms, and not by looking behind it. The federal government has been amply repaid for the expenditures in the construction of this road, great and wasteful as they may have been, by the resulting benefits to the nation.. It is now the road of Pennsylvania, subject only to the terms of the compact. In the act surrendering this road to the states respectively, through which it passes, Congress say, -ft and .the United States shall not thereafter be subject to any expense for repairing said road.” To. get clear of this expense was the object of the cession of it to the states. But does this affect the question under consideration. The repairs of the road are provided for, by the tolls which the state of Pennsylvania is authorized to impose. And this is the meaning of the above provision. It is supposed, that the exaction of toll’on the mail-stage' would conflict with that provision. -But how does it conflict with it? The toll on the mail-stage is not paid by the government, but by the contractor. And whether this toll will increase the price paid by the.government for the transportation of the mail, is a matter that cannot be detérmined. Competition is invited and.bids are made for this service, and the price to be'paid depends upon 'contingent circumstances. The toll would be paid, in' part, if not in whole, by a small increase of price for the transportation of passengers. The profits of the contractor might, perhaps, be somewhat lessened by the toll, or it might increase, somewhat, the cost of Conveying the mail. But this, is indirect and contingent; • so that in no sense can it be considered as repugnant to the above' provision. “ The United States are not to be subject to any expense for repairing this roadand they are not, in the sense of the law, should the Post-office Department have to pay, under the contingencies named, a part of the toll stated. Whether it does pay it or- not, under future contracts, Cannot be known ; and what-' ’ ever expense it may pay, will be for the use, and not the repain, of the road.
The act of the 13th of June, 1836, which is supposed to be in violation of the compact, I will now consider. That act provides, That all wagons, carriages, or. other modes of conveyance, pass-^ upon that part of the Cumberland road which passes through Pennsylvania, carrying goods, cannon, or military stores belonging the United States, or to any individual state of the union, which excepted from the payment of toll by tire second section of an passed the 4th of April, 1831, shall extend only so far as to relieve such wagons, carriage's, and other inodes of conveyance, the payment of - toll to the proportional amount of such goods *178 so carried belonging to the United States, or to any of the individual states of the union ; and that in all cases of wagons, carriages. stages, or other modes .of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage, or other. modo oí conveyance, shall pay half-toll upon such modes of conveyance.”
By the act of 1831,- “every chariot, coach, coachee, stage, wagon, phaeton, or chaise, with two horses and four wheels, were •to- be charged at each gate twelve cents; for either of the carriages last mentioned, with four horses, eighteen cents.” Is the act of 1836, which imposes half-toll on “the mail-stage, with passengers or goods,” repugnant to the above provision ? I think it is not, in any respect.
, If the mail be. not the property of the United States, then the stage in which it is conveyed is not within the exception of the act of 1831, and it is liable to pay toll. That only which is within the exception is exempted. That the mail is in no sense the property of the United States, and was not so understood by the parties to the compact, has already been shown. 'It follows, therefore, that a law of Pennsylvania, imposing on such stage a half or full rate of toll, is no violation of the compact.
' -But, if the mail-stage were placed on a footing with á wagon or carriage laden with the property of the United States, is the act of 1836, requiring it to pay toll, a violation of the compact ? I think it is not. A wagon or carriage laden with the property' of the United States, means a wagon or carriage having, as before remarked, a full or usual load. Such a vehicle is exempted from toll by the act of 1831. But suppose such wagon or carriage should have half its load, of the property of the United States,-and the other half of the property of individuals, for which the ordinary price for transportation was paid; is such a wagon, thus laden, exempted from toll? Surely-it is not. An exemption under such circumstances would be a fraud upon the compact. It should be required to pay half-toll; and this is what the law of Pennsylvania requires. The mail-stage by that law is only half-toll, when it conveys passengers with the mad.; There is, then, no legal objection to the exaction of this toll. It is in .every point of view just, and within the spirit of the compact.
In. the argument for the United States, the broad ground was assumed, that no state had the power to impose a toll on a stage used' for the transportation of the mail. That it is a means of the federal government to cany into effect its constitutional powers, and, consequently, is not a subject of state taxation. To sustain this position the cases of McCulloch v. The State of Maryland, 4 Wheaton, 316, and Dobbins v. The Commissioners of Erie County, 16 Peters, 435, were cited.
In the first case, this court held, “that a state government had no *179 right to tax any of the constitutional means employed .by the. government of the union, to execute its constitutional- powers.” And the Bank of the United States was held to be a means of the government. In the second case, under a general law of Pennsylvania imposing a tax on all .officers, a tax was assessed on the office held by. the-plaintiff, as captain of a'revenue-cutter of the United'States,’ and this court held that such law, so far as it affected such an officer, was unconstitutional and void. ' The court say, “ there is. a concur? rent right of legislation in the states and the United States, except, as both are restrained by the Constitution of the .United-:States. Both are restrained by express prohibition^ in the Constitution; and the states by such as are reciprocally implied when the exercise of a right by a state conflicts with the perfect execution of another sovereign power delegated to the United States. That occurs when taxation by a state acts upon the instruments and emoluments • and persons which the United States may use and employ as .necessary and proper means to execute their sovereign power.”
Neither of these cases reach or affect, the principle involved in the case under consideration. The officer .'of the United States was considered as a means or ’instrument of the government, and, therefore, could not be taxed by the state, as an officer. . To make that case the same in principle as .the ohe before us, 'the officer must claim exemption from toll as a means of the government, in passing. over a toll-bridge or turnpike-road constructed by. a state, or by-an association of individuals, under a state law.. 'The principle of the other case is equally inapplicable»' Maryland taxed, the' franchise of the Bank, of the United States, and if the law' establishing- that bank were constitutional, the franchise ivas- no -more liable 'to taxation by a state than rights and privileges' conferred on one or more individuals, under any law of the union. With the same .propriety a judge of the United States might be subjected to a tais .by- a'state for the exercise of his judicial functions. And so of every other officer and public agent. But the court held that the stock ip the bant owned by a citizen might be taxed.
A toll exacted for the passage over a. bridge or on a.tumpike-roád is not, strictly speaking, a tax. - It is a. compensation for a benefit-conferred. Money has been expended in the’ construction of the road .or bridge, which adds greatly to- the comforts and facilities of travelling, and on this ground compensation is demanded. . Now, can the United States .claim the right to use such road or bridge free ■ from toll ? Can they place locomotives on the rail-roads of the states or of companies, and use them by virtue of their sovereignty ? Siich' acts, would appropriate private property for public purposes, without compensation; and this the Constitution of the union prohibits.
It is said, in the argument; that as well might U, revenue-cutter be taxed by a state ag to impose a toll on the stage which conveys thé mail. The revenue-cutter plies on the thoroughfare of natiolis or of *180 the. state, which is open to all vessels. But the stage passes over an artificial structure of great expense, which is only common to all who pay for its use a reasonable compensation- There can be no difficulty on this point. At no time, it is believed, has the Post-office Department asserted the right to use the turnpike-roads of a state, in the transmission of the mail, free from toll.
Pennsylvania stands pledged to keep the road in repair, by the use of the means stipulated in the compact. And she has bound herself, “ that, no change, alteration, or amendment shall ever be adopted that will in any wise defeat or affect the true intent and meaning of the aót of 1831.” In my judgment, that state has in no respect violated the compact by the act of 1836. If the mail-stage can be included in the exemption by the terms, “ wagon or carriage laden with the property of the United States,” still the half-toll on such stage, when it contains passengers, is within the compact. But, as has been shown, the mail-stage is not included in the exemption, and, consequently, it was liable to be charged with full toll. The state, therefore, instead of exceeding its powers under the compact, has not yet exercised them to the extent which the act of 1831 authorizes;
Mr. Justice DANIEL.
With the profoundest respect for the opinions of my brethren, I find myself constrained openly to differ from the decision'which, on behalf of the majority of the court, has just been pronounced. This case, although in form a contest between individuals, is in truth a question between the government of the United States and the government of Pennsylvania. It is, to a certain extent, a question of power between those two governments; and, indeed, so far as it is represented to be a question of compact, the very consideration on which the interests of the federal government are urged involves implications) affecting mediately or directly what are held to be great and fundamental principles in our state and federal systems. It brings necessarily into view the operation and effect of-the compact insisted upon as controlled and limited by the powers of both the contracting parties. In order to show more plainly the bearing of the principles above mentioned upon the case before us, they will here be more explicitly, though cursorily, referred to.
I hold, then, that neither Congress nor the federal government in the exercise of all or any of its powers or attributes, possesses the power to construct roads, nor any.other description of what have been called internal improvements, within the' limits of the states. That the territory and soil of the several states appertain to them by’ title-paramount to the Constitution,.-and-cannot be taken, save with the exceptions of those portions ther.eof-which might be ceded for the seat; of the federal government and for sites permitted to be purchased for forts, arsenals, dock-yards, &c., &e. That the power of *181 the federal government to acquire, and that of the states to cede to ■that government portions of their territory, are by the Constitution limited to the instances ■ above adverted to, and that these powers can neither be enlarged nor modified but in virtue of some new faculty to be imparted by amendments of the Constitution. I believe that the áuthority vested in Congress by the Constitution to establish post-roads, confers no right to open new roads, but implies nothing beyond a discretion in the government in the' regulations it may make for the Post-office Department for the selection amongst-various routes, whilst they continue in existence, of those along which it may deem it most juclicioüs to have the mails transported. I do not believe that this power given to Congress expresses or implies any thing peculiar in relation to the means or modes of transporting' the public mail, or refers to any .supposed means or modes of transportation beyond the usual manner existing and practised in the country, and certainly it cannot be understood to destroy or in any wise to affect the proprietary rights belonging to individuals or companies vested in those roads. It guaranties to' the government the right to avail itself of the facilities offered by those roads for the purposes of transportation, but imparts to it no exclusive rights — it puts the government upon the footing of others who would avail themselves of the same facilities.
In accordance with the principles above stated, and which with me are fundamental, I am unable to perceive how the federal government could acquire any power over the Cumberland road by making appropriations, or by expending money to any amount for its construction or repair, though these appropriations and expenditures may have been made with the assentj and even with the solicitation of Pennsylvania. Neither the federal government separately,nor conjointly with the state of Pennsylvania, could have power .to repeal the Constitution. Arguments drawn from convenience or inconvenience can have no force with me in questions of constitutional power; indeed, they .cannot be admitted at all, for if once admitted, they sweep away every barrier erected by the Constitution against implied authority, and may cover every project which the human mind may conceive. It matters not, then, what or how great the advantage which the government of the United States may-have proposed to itself or to others in undertaking this road; such purposes or objects could legitimate no acts either expressly forbid--, den or not plainly authorized. If the mere, appropriation or disbursement of money can create rights in the government, they may-extend this principle indefinitely, and with the very worst tendencies — those tendencies would be the temptation to prodigality in the government and a dangerous influence with respect to others.
In my view, then, the federal government could erect no tollgates nor make any exaction of tolls upon this road; nor could that government, in consideration of what it had done or contributed, *182 constitutionally and legally demand of the state of Pennsylvania the regulation of tolls either as to the imposition of particular rates or the exemption of any species of transportation upon it. As a matter of constitutional and legal'power and authority, this appertained to the state of Pennsylvania exclusively. Independently, then, of any stipulations with respect to them, vehicles of the United States, or vehicles transporting the property of the United States, and that property itself, would, in passing over this road, be in the same situation precisely with Vehicles and property appertaining to all other persons; they would be subject to the- tolls regularly imposed by law. There can be no doubt if the road were vested in a company or in a state, that either the company or the state might stipulate for- any rate of toll within the maximum of their power, of might consent to an entire exemption; and such stipulation, if madexfor a valuable or a legal consideration, would be binding.
The United States may contract with companies or with .communities for the transportation of their mi ils, or any of their property, as well as with carriers of a different description; and consequently could contract with the state of Pennsylvania. But Ifchat is meant to be insisted on here is, that the government could legally claim no power to collect tolls, no exemption from tolls, nor any diminution of tolls in their favour, purely in consequence of their having expended money on the road, and without the recognition by Pennsylvania of that expenditure, as a condition in any contract they might make with that state. Without such recognition, the federal government must occupy the same position 'with other travellers or carriers, and remain, subject to every regulation of her road laws .which the state could legally impose on others.
This brings us to an examination of the statutes of Pennsylvania, and to an inquiry into any stipulations which the state is said' to have made with the federal government, as' declared in those statutes. That examination will, however, be premised by some observations, which seem to be called for on this occasion. These acts of the Pennsylvania legislature have been compared with the acts of other legislative bodies relative to this ro.ád, and it has been supposed that the Pennsylvania laws should be interpreted in conjunction with those other state laws, and farther, that all these separate state enactments should be taken, together with the acts of Congress passed as to them respectively, as forming one, or as parts of one entire compact with the federal government. I cannot concur in such a view of this case. On the contrary, I must consider each of the states that have legislated in respect to this road, as competent to 'speak for herself; as speaking in reference-to her own interests and policy, and independently of-all others; and unshackled by the proceedings of any others. By this rule of construction let us examine the statutes of Pennsylvania. The act of April 4th, 1831, Which may be called the compact law as it contains all that Pennsylvania professed to undertake. *183 begins by stating the doubts , which were entertained upon the authority of the United States to erect toll-gates and to collect tolls on the Cumberland road; doubts which, with the government as well as with others,- seem to have ripened into certainties, inasmuch as, notwithstanding its large expenditures upon this road, the government had never exacted tolls for travelling or for transportation upon it. The statute goes on next to provide, that if. the government of the United States will make such farther expenditures as shall put the road lying within the limits of Pennsylvania in complete repair,. Pennsylvania will erect toll-gates and collect tolls upon the road, to be applied to the repairs and preservation of it. The same act invests the commissioners it appoints to superintend the road, with power to increase of diminish the tolls to be levied; limiting the increase by the rates which the state had authorized upon an artificial roád that she had established 'from the Susquehanna, opposite the borough of Harrisburg, to Pittsburg. Then in the act of 1831 are enumerated the subjects.of toll, and the rates prescribed as to each of'those subjects. Amongst the former are mentioned chariots,' coaches, coache.es, stages, wagons, phaetons, chaises. In the 3d pro- • viso to the 2d section it is declared, “that no toll shall be received or collected for the passage of any wagon or carriage laden with the property of the United States, or any cannon or military stores belonging to the United States, or to-any of the states belonging to this union.” On the 13th of June, 1836, was passed bythe legislature of Pennsylvania, ■“ An act relating to the tolls on that part of the Cumberland road which passes through Pennsylvania.” The 1st section of this act is in the following words:' “All wagons, carriages,.or other modes of conveyance, passing upon that part of the Cumberland road which passes through Pennsylvania, carrying goods, cannon, or military stores, belonging to the United States, or to any individual state of the union, which are excepted from the payment of toll by the second section of an act passed the fourth of April, qnno Domini eighteen hundred and thirty-one, shall extend only so far as to relieve such wagons, carriages, and other modes of . conveyance, from the payment -of toll to the proportional amount of such goods so carried, belonging to the United States, or to any of the individual states of the union; and that in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, stage,, or other mode of conveyance, shall pay hall-toll upon such modes of conveyance,”
. Upon the' construction to be given to the ist and 2d sections of the statute of 1831, and to the 1st section of the statute of 1836, depends the decision of the case-before us. By thé' defendant in error it is insisted that, by the sections of the act of 1831 above “Cited, stages or stage-coaches, transporting the mail of the United States, are wholly exempted by compact from the payment of tolls, although the mails may constitute but a small portion of their lading; and *184 those vehicles'may be at the same time freighted for the exclusive profit of the rhail contractors, with any number of passengers, or with any quantity of baggage or goods, which can be transported in them, consistently with the transportation of the mail; and that the 1st section of the act of 1836, which declares that “ in all cases of wagons, carriages, stages, or other modes of conveyance, carrying the United States mail, with passengers or goods, such wagon, -stage, or other mode' of conveyance, shall pay half-toll upon such mode of conveyance,” is a violation of the compact. Let us pause here, and inquire what was the natural and probable purpose of the exemption contained in the act of 1831 ? Was that exemption designed as a privilege or facility to the government, or as a' donation for private and individual advantage ? Common sense would seem to dictate the reply, that the former only was intended by the law; and even if the privilege or facility to the government could be best secured by associating it with individual profit, Certainly that privilege or facility could, on no principle of reason or fairness, be so sunk, so lost sight of, so entirely perverted, as to make it a mean chiefly of imposition and gain on the part of individuals, and the cause of positive and serious public detriment; and such must be the result of the practice contended for by the defendants in error, as it would tend to impede the celerity of transportation, and to destroy the road itself, by withholding the natural and proper fund for its maintenance. Passing then from what is believed to be the natural design of these enactments, let their terms and language be considered. By those of the 2d section of the law of 183.1, every stage or wagon is made expressly liable to toll, without regard to the subjects it might transport, and without regard to the ownership of the vehicle itself. The terms of the law are universal; they comprehend all stages and all wagons; they would necessarily, therefore, embrace stages and wagons of the United State's, or the like vehicles of others carrying the property of the United States or of private persons. If, then, either the vehicles of the United States, or of others carrying the property of the United States, have been withdrawn from the operation of the act of 1831, this can have been done only by force of the 3d proviso of the 2d section'of that act. The proviso referred to declares that no toll shall “ be collected for the passage of any wagon or carriage laden with the property-of the United States,” &c., &c. Can tins proviso be understood as exempting stages, whether belonging to the government or to individuals, which were intended purposely to carry the mail? It is not deemed necessary, in interpreting this proviso., to discuss the question, whether the United States have a property in mails which they carry. ' It may be admitted that the United States and all their contractors have in the mails that-property which vests by law in all'common earners; it may be admitted that the. United States have an interest in the mails even beyond this. These admissions do not vary the real inquiry here, *185 which is, whether by this proviso the mails of the United- States, or the carriages transporting them, were -intended to be exempted from tolls?. This law, like every other instrument, should be interpreted according to the common and received acceptation of its words; and artificial or technical significations of words or phrases shoüld not be resorted to, except when unavoidable, to give a sensible meaning to the instrument, interpreted; or when they may be considered as coming obviously within the understanding and conteinplation of the parties. According, to this rule of interpretation, what would be commonly understood by “ the property of the United' States,” or by the phrase “ wagons and carriages laden with the property of the United States?” Would common intendment apply those terms to the mail of the United States, or to vehicles carrying that mail ? The term “ mail” is perhaps universally comprehended as being that over which the government has the management for the purposes of conveyance and distribution; and it would strike the common understanding as something singular, to be told that the money or letters belonging to the citizen, and for-the transportation of which he pays,' was hot his property, but was the property of the United States. The term “mail,” tifien, having a meaning clearly defined and.universally understood, it is conclusive to my mind, that in a provision designed to exempt that mail, or the vehicle for its transportation, the general and equivocal term “property”-would not have been selected, but the terms “ mail,” and “ stages carrying the mail” — terms familiar to all — would have been expressly introduced.
Farther illustration of the language and objects of the legislature of Pennsylvania may be derived from the circumstance, that, in the law of 1831, they couple the phrase “ property of the United States” with “ property of the states.” The same language is used in reference to both; they are both comprised-in the same sentence; the same exemption is extended to both. Now the states have no mails to be transported. It then can by no means follow, either by necessary or even plausible interpretation, that by “ property of the United States” was meant the “mails of the United States,” any more than by “ property of the states” was meant the “mails” of those states; on the contrary, it seems far more reasonable that the legislature designed to make no distinction with regard to either, but intended that the term “property” should have the same signification in reference both to the state and federal governments.
In theacceptation of the term “property,” insisted on for the defendants in-error, the mails committed to the contractor are the property of that contractor also. Yet it would. hardly have been contended that in a provision for exempting the “ property” of a mail contractor from tolls, either a vehicle belonging to the United States, and in the use of such a contractor, or the mail which he carried in it, would be so considered as his property as to bring them within that exemption ; yet such is the conclusion to which the interpretation contended *186 for by the defendants would inevitably lead. That construction I deem to be forced and artificial, and not the legitimate interpreta-tiqrrof the statute, especially when I consider that- there are various other subjects of property belonging to the United' States, and belonging to them absolutely and exclusively, which from their variety .could not well be- specifically enumerated, and which, at some pe-. riod or other, it might become convenient to the government and beneficial to the country to transport upon this road. But if, by -any interpretation,the words “wagon or carriage laden with the proper.ty of the United States,” can be made to embrace stages carrying the mail, and employed purposely for that service, they surely can-hot, by the most forced-construction, be. made to embrace stages laden with every thing else, by comparison, except the mail of the United States, and in which the mail was a mere pretext for the transportation of passengers and merchandise, or property of-every description and to any amount, free of toll. ' They must at all events be laden with the mail. The term laden cannot be taken here as a mere expletive, nor should it be wrested from its natural import — be made identical in signification with the terms ■■“carrying” or “transporting.” Such a departure would again be a violation of common intendment, and should not be resorted' to; and Hie abuses just shown, which such a departure would let in and protect, furnish another and most cogent reason- why the common acceptation of the phrase, “ property of -the United States,” should be adhered to. Fairness and equality with respect to all carriers and travellers upon this road,-and justice to the state which has undertaken to keep it in repair from the tolls collectable upon it, require this adherence.
If the interpretation here given of the act of 1831 be correct, then admitting that act to be a compact between Pennsylvania and the United State's, the former has,- by the 1st section of the act of 1836, infracted no stipulation in that compact. Pennsylvania never did, according to my understanding of her law of 1831, agree to the exemption from, tolls for stages,"wagons, or vehicles of any kind, intended for carrying the mails of the United States. These stood upon the like footing with other carriages. If this be true, then by the act of 1836, in which she has- subjected to half-tolls only, stages, wagons, &c., carrying the mails, and at the same time transporting passengers or goods, so far from violating her compact,- or inflicting a wrong upon the government or upon mail contractors, that state has extended to. them a-privilege and an advantage which, under the 3d proviso of tire act of 1831, they did not possess. My opinion is, that 'the plaintiff in the court below had an undoubted right 'of recovery.